# EXHIBIT 1

EXECUTION COPY

# LOAN AND SECURITY AGREEMENT

**by and between**

**PETROGAS FIELD SERVICES, INC.**

**and**

**FDI CAPITAL, LLC**

**Dated as of**

**4 March 2021**

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (this "Agreement") is entered into as of 4 March 2021 (the "Effective Date"), by and between FDI Capital, LLC, a Virginia limited liability company ("Lender") and Petrogas Field Services, Inc., a Texas corporation ("Borrower").

## RECITALS

A.      Borrower desires to borrow funds from Lender and Lender has agreed to make certain financial accommodations available to Borrower, pursuant to the terms and conditions of this Agreement and related loan documents.

B.      Borrower and Lender are entering into this Agreement with the hope that Borrower will subsequently qualify for financing guaranteed by the Export-Import Bank of the United States ("EXIM"), with which Lender will assist Borrower as described in this Agreement.

**NOW, THEREFORE**, in consideration of the recitals above and the mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      **DEFINITIONS AND CONSTRUCTION**

1.1      Defined Terms.  In addition to those terms defined elsewhere in this Agreement, the following terms as used in this Agreement have the meanings set forth below.  Additionally, any term (whether capitalized or lower case) used in this Agreement that is defined in the UCC will be construed and defined as set forth in the UCC unless it is otherwise expressly defined in this Agreement.  If the UCC is used to define a term used in this Agreement and that term is defined differently in different divisions of the UCC, the definition of such term contained in Article 9 of the UCC will control.

"Account" means an account as that term is defined in Article 9 of the UCC.

"Account Debtor" means an account debtor as that term is defined in the UCC.

"Adjusted Transaction Costs" has the meaning set forth in Section 2.1(b)(iv).

"Advance" has the meaning set forth in Section 2.1(a).

"Affiliate" means—with respect to any Person—any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person, as well as each Person's equityholders, controlling lenders, managers, officers, directors, joint venturers or partners.  As used in this definition, "control," "controlled by" and "under common control with" (as well as other correlative usages, as applicable) mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of securities or other ownership interests, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Approved Transaction" has the meaning set forth in Section 2.1(b).

"Base Rate" has the meaning set forth in Section 2.2(a).

"Books" means books and records, including Borrower's records indicating, summarizing, or evidencing Borrower's assets (including the Collateral) or liabilities, Borrower's records relating to its business operations or financial condition, and Borrower's goods or General Intangibles related to such information.

"Borrower" has the meaning set forth in the preamble to this Agreement.

"Borrowing Base" has the meaning set forth in Section 2.1(b).

"Borrowing Base Certificate" has the meaning set forth in Section 2.1(b).

"Business Day" means any day on which the Federal Reserve Bank of New York is open for business.

"Chattel Paper" means chattel paper as that term is defined in the UCC.

"Closing Fee" has the meaning set forth in Section 2.5(a).

"Closing Date" means that date upon which Lender provides written notice to Borrower that all applicable conditions precedent in Section 3 have been met or have been waived by Lender.  In the event Lender does not provide written notice as described in the prior sentence, then the Closing Date will be the first date that Lender provides funds to Borrower under this Agreement.

"Collateral" means all of Borrower's real and personal property and interest in real and personal property wherever located and whether now owned or hereafter acquired or arising, including but not limited to the following and whether or not included in the definition of collateral under Article 9 of the UCC: (a) all Accounts; (b) all Books; (c) all Chattel Paper; (d) all Commercial Tort Claims; (e) all Deposit Accounts; (f) all documents and instruments; (g) all Equipment and Fixtures; (h) all General Intangibles; (i) all Goods; (j) all Inventory; (k) all Investment Related Property; (l) all Negotiable Collateral; (m) all Proceeds; (n) all Real Property; (o) all Supporting Obligations; and (p) all other money, cash, cash equivalents or other similar assets or rights of Borrower to the foregoing not described in this definition of Collateral

"Commercial Tort Claim" has the meaning defined in Article 9 of the UCC.

"Default" means any event which with the passing of time or the giving of notice or both would become an Event of Default.

"Deposit Account" has the meaning defined in Article 9 of the UCC.

"Effective Date" has the meaning set forth in the preamble.

"Equipment" has the meaning defined in Article 9 of the UCC.

"Event of Default" has the meaning set forth in Section 8.

"EXIM" has the meaning set forth in Recital B.

"Fixtures" has the meaning defined in Article 9 of the UCC.

"GAAP" means generally accepted accounting principles as in effect in the United States of America.

"General Intangibles" has the meaning defined in Article 9 of the UCC and includes without in any way limiting the foregoing all right, title and interest in or under any payment intangibles, contract or agreement, rights arising under statute, common law or regulation, right to payment or recoveries, claim in or under insurance policies, tax claim or refund, goodwill, license, intellectual property, infringement claim, interest in business association, permit, invention (whether or not patented or patentable), technical information (whether conceptual or produced), software, data, material, process, knowledge, expertise and/or experience.

"Governmental Authority" means (a) any United States federal, state, county, municipal or foreign government, or political subdivision thereof, (b) any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, (c) any court or administrative tribunal or (d) with respect to any Person, any arbitration tribunal or other non-Governmental Authority to whose jurisdiction that Person has consented.

"Guarantor" means any Person who is a guarantor under the Guarantee.

"Guarantee" is the guarantee executed in favor of Lender in substantially the form of Exhibit A.

"Insolvency Proceeding" means any proceeding commenced by or against any person or entity under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"Intellectual Property" means any and all patents, copyrights, trademarks, trade secrets, know-how, inventions (whether or not patentable), algorithms, software programs (including source code and object code), processes, product designs, industrial designs, blueprints, drawings, data, customer lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for registration or registrations thereof.

"Inventory" has the meaning defined in Article 9 of the UCC.

"Investment Related Property" means (i) any and all investment property as that term is defined in Article 9 of the UCC and (ii) regardless of whether classified as investment property under the UCC, all equity or other ownership rights and interests, debt, investment accounts and certificates of deposit.

"Lender" has the meaning set forth in the preamble to this Agreement.

"Lien" means any pledge, bailment, lease in the nature of a security interest, mortgage, hypothecation, conditional sales and title retention agreement, charge, encumbrance or other lien in favor of any Person.

"Liquidation Event" means (i) a merger of Borrower with another entity pursuant to which Borrower is not the surviving entity, (ii) the sale of all or substantially all of Borrower's assets, or (iii) a sale or other disposition of the equity interests of Borrower by either Borrower or the equityholders of Borrower which results in the equityholders immediately prior to such transaction owning less than 50% of the voting equity interests of Borrower immediately following such transaction, other than pursuant to (x) the sale of Borrower's equity interests in a public offering or (y) a bona fide equity financing through private or public solicitation and in such case of (x) or (y), only following the prior written permission of Lender for such transaction.

"Loan Document(s)" means this Agreement, the Guaranty and/or all other agreements, documents, instruments and certificates entered into in connection with this Agreement between or among Lender on the one hand and Borrower and/or Guarantors and their Affiliates, as applicable, on the other hand, all as amended, modified, supplemented, restated or extended from time to time.

"Loan Facility" has the meaning set forth in Section 2.1(a).

"Lockbox Account Agreement" means an agreement in the form of Exhibit D or a similar agreement executed by Lender, Borrower and applicable financial institutions and/or securities/investment intermediaries in which such financial institutions and/or intermediaries (i) agree that Lender has a security interest in certain accounts of Borrower and (ii) agree to follow any instructions given by Lender with respect to such accounts.

"Material Adverse Change" means a material adverse change in or effect on (i) the business, assets, operations, prospects, financial condition, properties or liabilities of Borrower or any Guarantor, (ii) the ability of Borrower to repay the Obligations or to perform its obligations under the Loan Documents or (iii) the priority of, or any impairment to (other than normal depreciation which is not covered by adequate insurance), Lender's Security Interest in the Collateral.

"Material Contract" means any contract or other arrangement, other than a Loan Document, to which Borrower or any Affiliate of Borrower is a party and for which the breach, nonperformance, cancellation or failure to renew by any party to the contract or other arrangement could reasonably be expected to cause a Material Adverse Change.

"Maturity Date" has the meaning set forth in Section 2.7(a).

"Negotiable Collateral" means letters of credit, letter-of-credit rights, instruments, promissory notes, drafts and documents as each such term is defined in the UCC.

"Notice of Borrowing" means the form used by Borrower to apply for an Advance, which is to be substantially in the form of Exhibit B. Each Notice of Borrowing will include a Borrowing Base Certificate completed by Borrower.

"Obligations" means all outstanding Advances, interest, fees, debts, loans, obligations, liabilities (including all amounts charged to Borrower's account pursuant to any agreement authorizing Lender to so do), guarantees, covenants and/or duties, and all similar items of any kind and description owed or owing by Borrower to Lender under any Loan Document, by law, or otherwise, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and any and all related interest, fees, expenses or levies thereon, including any such that but for any provision of the United States Bankruptcy Code would have accrued or arisen (including reasonable attorneys' fees and expenses and any interest, fees, or expenses that accrue after the filing of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any Insolvency Proceeding).

"Over-Advance" means, at any time and for any reason, any amount that has been advanced by Lender to Borrower that exceeds the maximum aggregate amount of Advances permitted under Section 2.1.

"Permitted Liens" means:

(a)     Any Liens existing on the Closing Date and disclosed on Schedule 5.7 or arising under this Agreement or the other Loan Documents in favor of Lender;

(b)     Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, provided the same have no priority over any of Lender's Security Interests;

(c)     Liens of carriers, warehousemen, suppliers, or other Persons that are possessory in nature arising in the ordinary course of business so long as such Liens attach only to Inventory and which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings which proceedings have the effect of preventing the forfeiture or sale of the property subject thereto and provided all such carrier, warehousemen, supplier or other possessory agreements have been disclosed in writing to Lender if such arrangements concern Inventory in excess of $50,000;

(d)     Liens in connection with (i) capitalized lease obligations and (ii) purchase money indebtedness, in the aggregate as to clauses (i) and (ii) not to exceed $50,000 in the aggregate principal amount at any time outstanding, in each case securing the purchase price of such fixed capital or assets or indebtedness incurred solely for the purpose of financing the acquisition, repair, improvement or construction of such fixed or

capital assets, or existing on such fixed or capital assets at the time of their acquisition, provided that the Lien is confined solely to the property so acquired or built or of such repairs or improvements thereon, and the proceeds of such fixed or capital assets;

(e)     Liens securing motor vehicles leased or owned solely for use in Borrower's businesses; and

(f)     Liens on insurance proceeds in favor of insurance companies granted solely as security for financed premiums.

"Person" means and includes any individual, any partnership, any corporation, any business trust, any joint stock company, any limited liability company, any unincorporated association or any other entity and any domestic or foreign national, state or local government, any political subdivision thereof, and any department, agency, authority or bureau of any of the foregoing.

"Proceeds" means all proceeds as described in the UCC in respect of the Collateral, including or in addition to whatever is received or receivable when Collateral or subsequent proceeds are sold, exchanged, collected, destroyed or otherwise disposed of, and all or any portion thereof or interest therein, whether tangible or intangible, and whether such sale, exchange, collection, destruction or disposition is voluntary or involuntary.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by Borrower or any subsidiary of Borrower and the improvements thereto.

"Security Interest" has the meaning set forth in Section 4.1.

"Supporting Obligation" has the meaning defined in Article 9 of the UCC, and includes letters of credit and guarantees issued in support of Accounts, Chattel Paper, documents, General Intangibles, instruments or Investment Related Property.

"Transaction Costs" means all costs, fees and expenses that Borrower will incur to complete an Approved Transaction that are expressly approved in writing by Lender, including: (i) the purchase price of equipment to be sold to Borrower's customers from third party vendors, such as Emerson Electric, Inc., and amounts to be paid to third party engineering, procurement and construction contractors, such as Bilk Elk Energy Systems, LLC, with respect to such equipment; (ii) export costs, freight and logistics costs, customs clearing charges, import duties and taxes, and inspection fees related to the foregoing; and (iii) within the country of destination, delivery and installation costs and related direct expenses. Transaction Costs will not include general overhead and indirect expenses of Borrower related to the foregoing, including salaries of Borrower's employees.

"Transaction Deposit" has the meaning set forth in Section 2.1(b)(ii).

"UCC" means the Uniform Commercial Code as adopted in the Commonwealth of Virginia, as amended from time to time; provided, however, that in the event that, by

reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the Commonwealth of Virginia, the term "UCC" will mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies.

1.2     Accounting Terms. All accounting terms not specifically defined herein will be construed in accordance with GAAP. When used herein, the term "financial statements" will include the notes and schedules thereto. Whenever the term "Parent" is used in respect of a financial covenant or a related definition, it will be understood to mean Parent and its subsidiaries on a consolidated basis as applicable unless the context clearly requires otherwise.

1.3     Construction. Construction. Unless the context of this Agreement or any other Loan Document clearly requires otherwise (a) references to the plural include the singular, (b) references to the singular include the plural, (c) the terms "includes" and "including" are not limiting, (d) the term "or" has the inclusive meaning represented by the phrase "and/or," (e) the words "hereof," "herein," "hereunder" and similar terms refer to the agreement or document in which they are used as a whole and not to any particular provision of the agreement or document, and (f) section, subsection, clause, schedule, and exhibit references relate to the agreement or document in which they are used. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document or similar item includes all amendments, restatements, joinders, renewals or replacements, and/or other revisions, modifications or supplements, as applicable. The words "asset" and "property" will be construed to have the same meaning and effect unless the context requires otherwise.

1.4     Schedules and Exhibits. Any schedules, exhibits or other attachments to this Agreement are part of this Agreement and/or otherwise incorporated herein by reference.

## 2.     TERMS OF THE LOAN

2.1     Loan Facility

(a)     Advances. Subject to the terms and conditions of this Agreement, Lender agrees to extend a revolving line of credit (the "Loan Facility") to Borrower, beginning on and after the Closing Date, in amounts as properly requested by Borrower ("Advances") such that at any one time the aggregate amount of Advances outstanding does not to exceed the lesser of (i) US$350,000 or (ii) the Borrowing Base as determined in subsection (b), below.

(b)     Borrowing Base. The "Borrowing Base" for an Approved Transaction equals the lesser of (x) 80% of the Transaction Costs for such Approved Transaction or (y) the Adjusted Transaction Costs for such Approved Transaction. The process to determine the Transaction Costs and Adjusted Transaction Costs for a transaction is as follows:

(i)     Lender will provide funds to Borrower only in connection with transactions for which Borrower has obtained written, transaction-specific approval from Lender. To obtain approval for a transaction, Borrower must provide to Lender all information that Lender requests regarding the potential transaction. Lender will evaluate

7

the transaction and approve or deny it in Lender's sole discretion.  A transaction that Lender has approved in writing as qualifying for funds under the Loan Facility constitutes an "Approved Transaction."  If Lender does not approve a transaction that Borrower presents to it (each, a "Non-Approved Transaction"), Borrower may, notwithstanding Section 12 below, seek and obtain third party financing, backed by an EXIM guaranty and/or EXIM insurance, solely for such Non-Approved Transaction; provided, that no collateral may be pledged as security for such financing other than (i) collateral that is subordinated to the Lender's security interest in the Collateral and (ii) the contracts, commitments and accounts receivable consisting of or relating solely to such Non-Approved Transaction.

       (ii)     For each Approved Transaction, the third-party purchaser must provide to Borrower a pro forma invoice in a form satisfactory to Lender that describes in reasonable detail the products and/or services that the third-party purchaser requests to purchase from Borrower.  Before Lender will disburse an Advance for an Approved Transaction, Borrower must provide to Lender (A) the third-party purchaser's pro forma invoice as well as (B) a document describing in detail satisfactory to Lender (1) all costs, fees and expenses that Borrower will incur to complete the Approved Transaction (which will include applicable Transaction Costs) and (2) any deposit or prepayment of any kind that Borrower (or any Affiliate or agent of Borrower) has received or will receive in connection with the Approved Transaction (each, a "Transaction Deposit").

       (iii)    Borrower and Lender shall discuss in good faith regarding the costs, fees and expenses that Borrower will incur and that Lender will approve as Transaction Costs for each Approved Transaction.  However, Lender in its sole discretion will determine which costs, fees and expenses that Lender approves as Transaction Costs.

       (iv)    The Adjusted Transaction Costs for any Approved Transaction equals the aggregate amount of all applicable Transaction Costs for such Approved Transaction minus the aggregate amount of all Transaction Deposits for such Approved Transaction.

       (c)    Example.  The following is an example of the application of Section 2.1(b) for illustrative purposes only:

- Borrower provides information to Lender about a potential transaction for which Borrower wishes to obtain financing under the Loan Facility.

- Lender approves the transaction in writing as an Approved Transaction under this Agreement.

- The applicable third-party purchaser provides a pro forma invoice to Borrower for US$100 of products and services for the Approved Transaction.

- Borrower provides the US$100 pro forma invoice to Lender.  At the same time, Borrower provides to Lender a document listing US$90 of costs, fees

and expenses for product and/or service procurement, transportation, logistics, import fees, etc., to complete the Approved Transaction.

- Lender approves US$90 as Transaction Costs.

- Borrower receives a Transaction Deposit of US$30 from the third-party purchaser.

- The Adjusted Transaction Costs for the transaction therefore equals US$90 minus US$30, or US$60.

- The Borrowing Base for the applicable Approved Transaction is therefore the lesser of (i) 0.8 times US$90 (US$72) or (ii) US$60.

2.2   Interest

(a)   Interest Rate.  Beginning on the Closing Date, interest will accrue daily on the full amount of the Loan Facility, whether or not Advances are disbursed, computed on the basis of a 30-day month and actual number of days elapsed in the period during which the interest accrues, at a fixed rate of two percent per month (the "Base Rate").

(b)   Default Rate.  Upon the occurrence of a Default or of an Event of Default, the Advances and all Obligations will bear interest at a rate equal to the Base Rate plus one-quarter percent (1/4%) per month.

(c)   Intent to Limit Charges to Maximum Lawful Rate.  In no event will the interest rate or rates payable under the Loan Documents, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction, in a final determination, deems applicable.  Borrower and Lender, in executing and delivering the Loan Documents, intend to agree legally upon the rate or rates of interest and manner of payment stated within the Loan Documents.  However, notwithstanding anything contained herein to the contrary, if the rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto,* as of the date of this Agreement, Borrower is and will be liable only for the payment of the maximum as allowed by law and payment received from Borrower in excess of such legal maximum will be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.3   Borrowing Procedure

(a)   Request.  Following execution of this Agreement and the fulfillment of all conditions that by their nature must be fulfilled prior to a disbursement of an Advance, Borrower will submit purchase orders relating to Approved Transactions to Lender for payment via an Advance.  To request an Advance, Borrower must submit to Lender a signed, completed Notice of Borrowing (including the Borrowing Base Certificate) no later than 11:00 a.m. Washington, DC time at least seven Business Days prior to the anticipated disbursement date.  Subject to the terms and conditions of this Agreement, Lender will disburse the requested Advance to the applicable party by wire transfer or by such other manner as agreed by Lender and Borrower.



(b)  Records.  Lender will maintain an account in its books and records in the name of Borrower relating to the Advances and the Obligations. The Advances and the Obligations may be evidenced at Lender's discretion by one or more promissory notes in form and substance satisfactory to Lender.  However, absent manifest error, Lender's books and records relating to the Advances and the Obligations will constitute the record evidencing outstanding amounts of the Advances and the Obligations.

2.4    Payments

(a)  Payments.  All interest, costs, expenses or fees payable hereunder or under any other Loan Document will be due and payable, in arrears, on the first day of the month.  All such interest, costs, expenses or fees that are not paid when due will be compounded and will thereafter accrue interest at the applicable interest rate.

(b)  Due Date.  The Obligations and any other related fees, expenses or other amounts owing under the Loan Documents will be due and payable upon the earlier of (i) the Maturity Date, (ii) the occurrence of an Event of Default that is not cured within the applicable cure period, or (iii) such other time as may be required or permitted under the terms and conditions of the Loan Documents.

(c)  Over-advance.  If an Over-Advance occurs, Borrower will immediately make a payment to Lender in at least the amount necessary to reduce Borrower's outstanding aggregate balance of Advances to the maximum amount permitted under Section 2.1.

(d)  Voluntary Prepayment.  Subject to all other terms and conditions of this Agreement, upon Borrower's prior written notice to Lender, Borrower may repay Obligations with respect to an Advance at any time and from time to time without fees or penalties of any kind other than a prepayment fee set forth in Section 2.5(d), if applicable.

(e)  Mandatory Payment upon Event of Default.  Upon the occurrence of an Event of Default, Lender may in its sole discretion require Lender to pay to all Obligations and other related fees, expenses or other amounts owing under the Loan Documents.

(f)  Mandatory Payment upon Liquidation Event.  In the event of a Liquidation Event, Borrower will pay to Lender at least one Business Day prior to such Liquidation Event all Obligations and any other related fees, expenses or other amounts owing under the Loan Documents.

(g)  Crediting Payments.  All payments, including any prepayments, by Borrower under the Loan Documents must be made by wire transfer in immediately available US dollar funds to Lender at an account designated by Lender, or at such other place and manner of payment as agreed in writing by Borrower and Lender, without setoff or counterclaim.  Except as otherwise expressly provided herein, all payments by Borrower must be received into the account of Lender no later than 5:00 p.m. Washington, DC time on the date required or specified. Any payment received by Borrower later than 5:00 p.m. Washington, DC time will be deemed to have been received on the following Business Day and any applicable interest, fee or expense will continue to accrue until the following Business Day.  Should any payment not be honored when presented for payment, then Borrower will be deemed not to have made such payment and



all applicable interest, fees and expenses will continue to accrue accordingly. If any payment is due on a day other than on a day that is a Business Day, then such due date will be extended automatically to the next Business Day and interest will be charged at the then-applicable rate during such extension.

      (h)    Payment Application. All payment (including prepayment) amounts will be applied at Lender's discretion (a) first, to any amounts other than interest or principal that may be due and payable by Borrower with respect to the Obligations as of such time, (b) next, to any accrued and unpaid interest due on the Obligations, and (c) finally, to the outstanding principal of the Obligations.

      2.5    Fees. As partial consideration for the costs, expenses and labor that Lender has incurred or will incur in connection with facilitating the Loan Facility and the Advances, Borrower will pay to Lender the following fees:

      (a)    Closing Fee. Borrower will pay to Lender a fee equal to three percent of the Loan Facility (the "Closing Fee") payable on the Closing Date or at such earlier time as agreed by the parties. The Closing Fee is fully earned and due as of the Effective Date and is non-refundable.

      (b)    Late Fee. If any payment is not made within ten days after the date such payment is due, Borrower will pay to Lender a late fee equal to the lesser of (i) five percent of the amount of such unpaid amount or (ii) the maximum amount permitted to be charged under applicable law, in any case not less than $100.00.

      (c)    Administration Fees. If Lender incurs any costs, fees or expenses from any financial institution, attorney, government entity or other Person relating to the administration of this Agreement, the other Loan Documents or the transactions hereunder, then Borrower will reimburse Lender for such costs, fees or expenses within 30 days after receiving written notice thereof. To clarify the foregoing, Lender's costs, fees and expenses incurred during the negotiation and closing of this transaction and the issuance of the first Advance are not administration fees described in this section.

      (d)    Prepayment Fee. Lender has incurred costs and undertaken material efforts and will continue to incur costs and undertake efforts—including costs and efforts associated with Lender's preparation and readiness to provide Advances to Borrower during the term of this Agreement—to effectuate this Agreement and the transactions contemplated herein, with the expectation that each party will derive benefits therefrom. Accordingly, if Borrower repays all Obligations in full and terminates or sets aside this Agreement within three months following the Closing Date, then Borrower will pay to Lender as partial consideration for Lender's costs and efforts under this Agreement a fee equal to (i) the full amount of interest that would be due and owing if the Agreement was in effect for three months following the Closing Date, minus (ii) the amount of interest that Borrower has paid up to the date that Borrower terminates the Agreement. Any such prepayment fee becomes part of the Obligations.

2.6     Use of Proceeds.  Borrower will use Advances solely to fulfill approved expenses relating to Approved Transactions.  Lender must expressly approve in writing any change to the use of Advances.

2.7     Term.

(a)     Maturity.  This Agreement will continue in full force and effect for a term of six months, beginning on the Closing Date (the "Initial Maturity Date").  Lender may at its discretion agree to extend the term for additional periods beyond the Initial Maturity Date by notifying Borrower in writing, at least thirty days before the end of the then-current term, of Lender's willingness to extend the term and the length of the proposed extension.  If Borrower agrees to such extension, Borrower will deliver written notice of such agreement at least fifteen days prior to the end of the then-current term.  Accordingly, the term "Maturity Date" means (i) the Initial Maturity Date, if the parties do not elect to extend the initial term of the Agreement, or (ii) such later date as the parties agree to extend the term.  Notwithstanding the fact that the parties may extend the term of the Agreement, Lender may terminate its obligations under this Agreement earlier if otherwise required or provided herein.  Further, subject to all other provision of this Agreement, Borrower may terminate this Agreement and the Loan Facility at any time prior to the Maturity Date upon the payment in full of all outstanding Obligations then owing to Lender.  Upon the termination of this Agreement and the Loan Facility and the fulfillment all Obligations, the assignment of Borrower's EXIM export credit insurance required herein will immediately terminate and Lender will take any and all necessary actions requested by Borrower to effect such termination.

(b)     Effect of Maturity.  On the Maturity Date, the Loan Facility will automatically terminate and all of the Obligations will become due and payable immediately without notice or demand, and Borrower will be required to repay all Obligations in full.  No termination of the Loan Facility will relieve or discharge Borrower of its duties, obligations, or covenants hereunder or under any other Loan Document.  Lender's Liens in the Collateral will continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Loan Facility has been terminated.  When all Obligations have been paid in full and Lender's obligations to provide additional credit have been terminated irrevocably, Lender will, at Borrower's expense, execute and deliver (or alternatively, authorize Borrower to execute and deliver) applicable termination statements, lien releases, mortgage releases, discharges of security interests, and other similar discharge or release documents as are reasonably necessary to release Lender's Liens and all notices of security interests and liens previously filed by Lender.

3.     **CONDITIONS OF BORROWING**

3.1     Conditions Precedent to Initial Advance.  Notwithstanding any other term in this Agreement, the obligation of Lender to make the initial Advance is subject to the fulfillment of each of the following conditions to the reasonable satisfaction of Lender, in its sole discretion:

(a)     Borrower and all applicable other parties will have executed and delivered to Lender or its designees this Agreement and all other Loan Documents as requested by Lender.

12

(b)     The representations and warranties of Borrower in this Agreement and of Borrower and all applicable other parties in all other Loan Documents are true and correct in all material respects (except that such materiality qualifier will not be applicable to any representation or warranty that already is qualified or modified by materiality in its text) on and as of the date of such extension of credit, as though made on and as of such date, except to the extent that a representation or warranty relates solely to an earlier specific date, in which case the representation or warranty was true and correct as of such date.

(c)     No Default or Event of Default exists under this Agreement, any other Loan Document or any Material Contract, and no event exists which, upon the lapse of time, service of notice, or both, would constitute an Event of Default hereunder or thereunder, and no Default or Event of Default will result from the execution of this Agreement and/or the transactions contemplated hereunder.

(d)     Lender will have received such documents, instruments and agreements, including UCC financing statements or amendments to UCC financing statements, as Lender reasonably requests to evidence the perfection and priority of the security interests granted to Lender.

(e)     Borrower will have executed and delivered to Lender a Notice of Borrowing, which will include a Borrowing Base Certificate.

(f)     If Lender elects, Borrower will have delivered to Lender an officer's certificate of Borrower with copies of the following documents attached: (i) the certificate of incorporation and bylaws of Borrower certified by Borrower as being in full force and effect on the Closing Date, (ii) incumbency and representative signatures, and (iii) resolutions authorizing the execution and delivery of this Agreement and each of the other Loan Documents.

(g)     Lender will have received a good standing certificate for Borrower from Borrower's jurisdiction of formation and any other state or jurisdiction where Borrower is, or is required to be, qualified to do business.

(h)     Buyer will have undertaken or will be undertaking to Lender's satisfaction all actions necessary or reasonable to put into effect both the lockbox account and any automatic transfers to the lockbox account as required by Section 6.2 of this Agreement.

(i)     Lender will have received evidence satisfactory to Lender of the insurance coverage required by Section 6.10 of this Agreement.

(j)     Lender will have received evidence of Borrower's assignment of its EXIM export credit insurance as required by Section 6.11 of this Agreement.

(k)     Lender will have received all necessary consents of Borrower's stockholders and other applicable third parties with respect to the execution, delivery and performance of this Agreement, the other Loan Documents and the transactions hereunder.

(l)     Borrower will be in compliance in all material respects, as determined by Lender, with all agreements between or among Borrower its customers and/or any of their

13

designated agents or assigns or any other relevant party in connection with the Approved Transaction.

(m)     Borrower will have received a pro forma invoice or similar document(s), in form and substance acceptable to Lender, describing the products and services that Borrower will provide in the applicable Approved Transaction.

(n)     Borrower will have confirmed to Lender in writing that Borrower's fulfillment of the Approved Transaction, including but not limited to the purchase, shipment, storage and ultimate sale of goods, will comply in all material respects with any purchase orders, purchase agreements and/or other related instruments relevant to such Approved Transaction. Such written confirmation will be included with the Borrowing Base Certificate.

(o)     Lender will have received current financial statements of Borrower as of a date and in form and substance satisfactory to Lender.

(p)     No Material Adverse Change has occurred since the date of the financial statements regarding the business, prospects, operations, assets or condition of Borrower, financial or otherwise, and no event or circumstance has occurred and is continuing that would reasonably be expected to have a Material Adverse Change.

(q)     Borrower will have delivered such other documents and agreements, including but not limited to subordination agreements, releases, estoppel letters, etc., and Borrower or Lender will have undertaken such other matters, all as Lender in its sole discretion may deem reasonably necessary or appropriate.

3.2     Conditions Precedent to Subsequent Advances.  Notwithstanding any other term in this Agreement, the obligation of Lender to make subsequent Advances following the initial Advance is subject to the fulfillment, to the satisfaction of Lender in its sole discretion, of each of the following conditions:

(a)     The representations and warranties of Borrower in this Agreement and of Borrower and all other applicable parties in all other Loan Documents are true and correct in all material respects (except that such materiality qualifier will not be applicable to any representation or warranty that already is qualified or modified by materiality in its text) on and as of the date of such extension of credit, as though made on and as of such date, except to the extent that a representation or warranty relates solely to an earlier specific date, in which case the representation or warranty was true and correct as of such date.

(b)     No Default or Event of Default exists under this Agreement, any other Loan Document or any Material Contract, and no event exists which, upon the lapse of time, service of notice, or both, would constitute an Event of Default hereunder or thereunder, and no Default or Event of Default will result from the execution of this Agreement and/or the transactions contemplated hereunder.

(c)     Lender shall have received such documents, instruments and agreements, including UCC financing statements or amendments to UCC financing statements, as Lender

14

reasonably requests to evidence the perfection and priority of the security interests granted to Lender.

(d)    Borrower will have executed and delivered to Lender a Notice of Borrowing, which will include a Borrowing Base Certificate.

(e)    If Lender elects, Lender will have received a good standing certificate for Borrower from Borrower's jurisdiction of formation and any other state or jurisdiction where Borrower is, or is required to be, qualified to do business.

(f)    Lender will have received confirmation satisfactory to Lender that the lockbox account described in Section 6.2(a) and all agreements required to effect the automatic transfer of funds to the lockbox account described in Section 6.2(b) are both still in effect.

(g)    Lender will have received evidence satisfactory to Lender of the continuing insurance coverage required by Section 6.10 of this Agreement.

(h)    Lender will have received evidence satisfactory to Lender of the continuing assignment of Borrower's EXIM export credit insurance as required by Section 6.11 of this Agreement.

(i)    Lender will have received current financial statements of Borrower as of a date and in form and substance satisfactory to Lender.

(j)    Borrower will be in compliance in all material respects, as determined by Lender, with all agreements between or among Borrower its customers and/or any of their designated agents or assigns or any other relevant party in connection with the Approved Transaction.

(k)    If determined applicable by Lender, Borrower will have received and provided to Lender a pro forma invoice or similar document(s), in form and substance acceptable to Lender, describing the products and services that Borrower will provide using the additional Advance.

(l)    Borrower will have confirmed to Lender in writing that Borrower's use of the Advance will comply in all material respects with any purchase orders, agreements and/or other related instruments relevant to the applicable Approved Transaction. Such written confirmation will be included with the Borrowing Base Certificate.

(m)    No Material Adverse Change has occurred since the date of the financial statements regarding the business, prospects, operations, assets or condition of Borrower, financial or otherwise, and no event or circumstance has occurred and is continuing that would reasonably be expected to have a Material Adverse Change.

(n)    Borrower will have delivered such other documents and agreements, including but not limited to subordination agreements, releases, estoppel letters, etc., and Borrower or Lender will have undertaken such other matters, all as Lender in its sole discretion may deem reasonably necessary or appropriate.

4.    **SECURITY FOR THE OBLIGATIONS**

4.1    <u>Grant of Security Interest</u>.  In consideration for Lender providing the Loan Facility and for any Advances and other value provided hereunder, and to secure prompt payment when due (whether at stated maturity, by acceleration or otherwise) of any and all Obligations and prompt performance by Borrower of each of its covenants and duties under the Loan Documents, Borrower hereby unconditionally grants, transfers, assigns, and pledges to Lender a continuing security interest (the "<u>Security Interest</u>") in all of Borrower's right, title, and interest in and to the Collateral.

4.2    <u>Transfers and Other Liens</u>.  Borrower will not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral, except as expressly permitted by this Agreement, or (ii) create or permit to exist any Lien upon or with respect to any of the Collateral, except for Permitted Liens.  The inclusion of Proceeds in the Collateral will not be deemed to constitute Lender's consent to any sale or other disposition of any of the Collateral except as expressly permitted in this Agreement or the other Loan Documents.

4.3    <u>Security for Obligations</u>.  The Security Interest created hereby secures the payment and performance of the Obligations, whether now existing or arising hereafter, and constitutes a valid, first priority Security Interest in the existing Collateral and will constitute a valid, first priority Security Interest in Collateral acquired or arising after the date hereof, in each case subject only to Permitted Liens.  For avoidance of doubt, except in the case of Permitted Liens, the Collateral does not and will not secure any other obligations of Borrower without the prior written permission of Lender.

4.4    <u>Protection of Rights</u>.

(a)    Borrower authorizes Lender to file, without notice to Borrower, any financing statements or notices that Lender determines reasonably necessary in appropriate jurisdictions to perfect or protect Lender's interests and rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, will be deemed to violate the rights of Lender.

(b)    In the event that any Collateral, including Proceeds, is evidenced by or consists of Negotiable Collateral, certificated Investment Related Property, or Chattel Paper, Borrower will promptly (and in any event within five Business Days after receipt thereof) notify Lender thereof.  If and to the extent that perfection or priority of Lender's Security Interest is dependent on or enhanced by possession, Borrower will execute within five Business Days after request by Lender such documents and instruments as requested by Lender or, if applicable, endorse and deliver physical possession of such Negotiable Collateral, certificated Investment Related Property, or Chattel Paper to Lender, together with such undated powers (or other relevant document of transfer acceptable to Lender) endorsed in blank as requested by Lender, and will do such other acts or things deemed necessary or desirable by Lender to protect Lender's Security Interest therein.  If Borrower retains possession of any such instruments (which retention of possession will be subject to the extent permitted hereby), then promptly upon the request of Lender, such instruments will be marked with the following legend: "This

16

instrument and the obligations evidenced or secured hereby are subject to the Security Interest of FDI Capital, LLC."

(c)      Until an Event of Default occurs, except as otherwise provided in this Agreement or any other Loan Document, Borrower has the right to possession and enjoyment of the Collateral for the purpose of conducting the ordinary course of its business, subject to and upon the terms hereof and the other Loan Documents. Without limiting the generality of the foregoing, the parties intend that any record or beneficial ownership of any equity interests that constitute Collateral, including all voting, consensual, dividend, and distribution rights, will remain with Borrower until (i) the occurrence of and during the continuance of an Event of Default and (ii) Lender has notified Borrower of Lender's election to exercise its rights with respect to such equity interests.

4.5      Letter-of-Credit Rights. Letter-of-Credit Rights. If Borrower is or becomes the beneficiary of letters of credit having a face amount or value of $50,000 or more in the aggregate, then within five Business Days after becoming a beneficiary, Borrower will notify Lender thereof. Within five Business Days after requested by Lender, Borrower will enter into a tri-party agreement, in form and substance satisfactory to Lender, among Borrower, Lender and the issuer or confirming bank assigning letter-of-credit rights to Lender upon an Event of Default.

4.6      Borrower Remains Liable. Anything herein to the contrary notwithstanding, (a) Borrower will remain liable under the contracts and agreements included in the Collateral to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Lender of any of the rights hereunder will not release Borrower from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) Lender will not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement nor will Lender be obligated to perform any of the obligations or duties of Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

4.7      Real Property; Fixtures. Borrower will grant to Lender a first priority Mortgage (subject to Permitted Liens) on any fee interest in Real Property now or hereafter acquired. Upon Borrower's acquisition of any fee interest in Real Property having a fair market value in excess of $50,000, Borrower will notify Lender within two Business Days after the acquisition of such Real Property. Borrower will deliver such documentation and opinions, in form and substance reasonably satisfactory to Lender, in connection with the grant of any Mortgage as Lender may request at its discretion, including title insurance policies, financing statements, fixture filings and environmental audits. Borrower will pay all recording costs, intangible taxes and other fees and costs (including reasonable attorneys' fees and expenses) incurred in connection therewith. Borrower acknowledges and agrees that, to the extent permitted by applicable law, all Collateral will remain personal property regardless of the manner of its attachment or affixation to real property.

5.      **REPRESENTATIONS AND WARRANTIES**

17

In order to induce Lender to enter into this Agreement (i) Borrower hereby makes as of the Closing Date the following representations and warranties, each of which will be true, correct, and complete in all material respects (except that such materiality qualifier will not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) and (ii) Borrower makes at and as of the date of the making of each Advance (or other extension of credit) made after the Closing Date, each of the following representations and warranties to Lender, each of which will be true, correct, and complete, in all material respects (except that such materiality qualifier will not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), at and as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date), and such representations and warranties will survive the execution and delivery of this Agreement:

5.1    Due Organization and Qualification; Subsidiaries

(a)    Borrower (i) is duly organized and existing and in good standing under the laws of the jurisdiction of its organization, (ii) is qualified to do business in any jurisdiction where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    Set forth on Schedule 5.1(b) is a complete and accurate description of the authorized capital stock of Borrower by class, a description of the number of shares of each class that are issued and outstanding, and a description of all warrants, options, calls or other rights to shares of Borrower's capital stock, including rights of conversion or exchange under any outstanding security or other instrument.  Other than as described on Schedule 5.1(b), there are no subscriptions, options, warrants, or calls relating to any shares of Borrower's capital stock, including any right of conversion or exchange under any outstanding security or other instrument.  Borrower is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any security convertible into or exchangeable for any of its capital stock.

5.2    Due Authorization; No Conflict.

(a)    The execution, delivery, and performance by Borrower of the Loan Documents have been duly authorized by all necessary action on the part of Borrower.

(b)    The execution, delivery, and performance by Borrower of the Loan Documents do not and will not (i) violate any material provision of federal, state, or local law or regulation applicable to Borrower, the governing documents Borrower, or any order, judgment, or decree of any court or other Governmental Authority binding on Borrower, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of Borrower, other than Permitted Liens, or (iv) require any approval of Borrower's interestholders or any approval or consent of any Person under any Material

18

Contract of Borrower, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of Material Contracts, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Change.

5.3     <u>Subsidiaries</u>.  Borrower has no subsidiaries or other entities under its direct or indirect control.

5.4     <u>Binding Obligations</u>.  Each Loan Document has been duly executed and delivered by Borrower and is the legally valid and binding obligation of Borrower, enforceable against it in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

5.5     <u>Governmental Consents</u>.  The execution, delivery, and performance by Borrower of the Loan Documents and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Lender for filing or recordation, as of the Closing Date.

5.6     <u>Compliance with Laws</u>.  Borrower is not (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes (including environmental laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change, or (b) is not subject to nor in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

5.7     <u>Title to Assets; No Encumbrances</u>.  Borrower has (i) good, sufficient and legal title to (in the case of fee interests in Real Property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good and marketable title to (in the case of all other personal property), all of its assets reflected in its most recent financial statements delivered to Lender, in each case except for (y) assets disposed of since the date of such financial statements to the extent permitted hereby, and (z) assets the aggregate value of which at any time does not exceed $25,000.  All of such assets are free and clear of Liens except for Permitted Liens which are set forth on <u>Schedule 5.7</u>.  Lender's Liens are or will be validly created, perfected and first priority Liens.

5.8     <u>Commercial Tort Claims</u>.  Borrower does not hold commercial tort claims in an aggregate amount greater than $25,000 as of the Closing Date.

5.9     <u>Litigation</u>.  There are no actions, suits, or proceedings that, as of the Closing Date, are pending or, to the knowledge of Borrower after due inquiry, threatened against Borrower.

5.10     <u>Fraudulent Transfer</u>.  Borrower is solvent.  No transfer of property is being made by Borrower and no obligation is being incurred by Borrower in connection with the transactions

19

contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud present or future creditors or equity holders of Borrower.

5.11    Employee Benefits.  Except as could not result in any liability to Borrower, neither Borrower nor any of its Affiliates maintains or contributes to any Benefit Plan, as defined under applicable law.

5.12    Environmental Condition.  To Borrower's knowledge, none of Borrower's properties or assets has ever been used in the disposal of, or used to produce, store, handle, treat, release, or transport, any hazardous materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, or would be in violation under current law, in any material respect, of any applicable law, including environmental laws, (b) to Borrower's knowledge, after due inquiry, none of Borrower's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous materials disposal site, (c) Borrower has not received notice that a Lien arising under any law, including environmental law, has attached to any revenues or to any Real Property owned or operated by Borrower and (d) neither Borrower nor any of its facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any law or environmental liability that, in the case of each of the foregoing clauses, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

5.13    Financial Accounts.  Set forth on Schedule 5.13 (as updated pursuant to the provisions of this Agreement from time to time) is a reasonably detailed listing and description, including names of financial institutions and account numbers, of all of Borrower's depository, operating and securities accounts other than accounts which hold less than $10,000.

5.14    Indebtedness.  Except as set forth on Schedule 5.14, there is no indebtedness of Borrower, in an amount greater than $50,000, outstanding immediately prior to the Closing Date that will remain outstanding after giving effect to the transactions contemplated hereunder on the Closing Date.

5.15    Employee and Labor Matters.  There is (i) no unfair labor practice complaint pending or, to the knowledge of Borrower, threatened against Borrower before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against Borrower which arises out of or under any collective bargaining agreement and that could reasonably be expected to result in a material liability, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened in writing against Borrower that could reasonably be expected to result in a material liability, or (iii) to the knowledge of Borrower, no union representation question existing with respect to the employees of Borrower and no union organizing activity taking place with respect to any of the employees of Borrower.  Borrower has not incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law which remains unpaid or unsatisfied.  The hours worked and payments made to employees of Borrower have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.  All material payments due from Borrower on account of wages and

employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Borrower.

5.16    Material Contracts.  Set forth on Schedule 5.16, as such Schedule may be updated from time to time, is a description of the Material Contracts, including the name, date and parties.  Borrower will amend Schedule 5.16 to add or remove Material Contracts by providing to Lender a written reasonable description (including the name, date and parties) of each additional Material Contract and the reason for its addition to or removal from Schedule.  Each Material Contract (a) is in full force and effect and is binding upon and enforceable against Borrower and, to Borrower's knowledge, each other Person that is a party thereto in accordance with its terms, (b) has not been otherwise amended or modified and (c) is not in default.

5.17    Payment of Taxes.  All tax returns and applicable reports of Borrower required to be filed by it have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other similar governmental charges imposed by a tax authority upon Borrower and upon its assets, income, businesses and franchises that are due and payable have been paid when due and payable.  Borrower has made adequate provision in accordance with GAAP for all taxes not yet due and payable.

5.18    Governmental Regulation.  Borrower is not subject to regulation under the Federal Power Act or the Investment Company Act of 1940, as amended, or under any other federal or state statute or regulation which may limit its ability to incur indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  Borrower is not a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940, as amended.

5.19    Patriot Act; FCPA.  Borrower is in compliance with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act").  No part of the proceeds of the loans made hereunder will be used by Borrower or any of its Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anticorruption laws.

5.20    OFAC.  Borrower is not in violation of any of the country or list based economic and trade sanctions administered and enforced by the US Department of Treasury's Office of Foreign Assets Control.  Borrower (a) is not a Sanctioned Person or a Sanctioned Entity as defined under applicable law, (b) has no assets located in Sanctioned Entities, or (c) does not derive revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  No proceeds of any loans made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

5.21   Intellectual Property.

(a)   To Borrower's knowledge, (1) Borrower has never infringed or misappropriated and is not currently infringing or misappropriating any Intellectual Property rights of any Person, and (2) no product manufactured, used, distributed, licensed, or sold by or service provided by Borrower has ever infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights of any Person.  There are no currently pending, or to Borrower's knowledge after reasonable inquiry, threatened infringement or misappropriation claims or proceedings pending against Borrower, and has not received any written notice of any actual or alleged infringement or misappropriation of any Intellectual Property rights of any Person.

(b)   To Borrower's knowledge after reasonable inquiry, all copyrights, trademarks, and patents that are owned or used by Borrower and necessary for the conduct of its business as currently conducted are valid, subsisting and enforceable and in compliance with all legal requirements, filings, and payments and other actions that are required to maintain such Intellectual Property in full force and effect.

(c)   Borrower has taken commercially reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all of Borrower's trade secrets that are necessary in its business.

5.22   Security Interest.  This Agreement creates a valid security interest in the Collateral of Borrower, to the extent a security interest therein can be created, securing the payment of the Obligations.  Except to the extent a security interest in the Collateral cannot be perfected by the filing of a financing statement under the UCC, all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or will have been taken upon the filing of financing statements listing Borrower, as a debtor, and Lender, as secured party.  Upon the making of such filings, Lender shall have a first priority perfected security interest (subject only to Permitted Liens) in the Collateral to the extent such security interest can be perfected by the filing of a financing statement.

5.23   Complete Disclosure.  All factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) furnished by or on behalf of Borrower to Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents and the transactions contemplated therein, and all other such factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrower's industry) hereafter furnished by or on behalf of Borrower to Lender was and/or will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

5.24   Broker's Fees.  Borrower has not used any broker, finder or similar Person in connection with this Agreement and the transactions contemplated hereunder.  In the event that

any broker, finder or similar Person makes any claims for fees, expenses or otherwise in connection with this transaction, Borrower will defend and hold Lender harmless against any and all such claims.

5.25    No Material Adverse Change.  Since December 31, 2020, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Change.  All historical financial statements relating to Borrower that have been delivered to Lender have been prepared in accordance with GAAP and present fairly in all material respects Borrower's consolidated financial condition as of the date thereof and results of operations for the period then ended.

5.26    Full Disclosure.  No representation, warranty or other statement made by Borrower in any Loan Document, certificate or written statement furnished to Lender, as of the date made and taken together with all such written certificates and written statements given to Lender, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in such certificates or statements not misleading (it being recognized that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results).

6.    **AFFIRMATIVE COVENANTS**

Borrower covenants and agrees that, until termination of the Loan Facility and payment in full of the Obligations, Borrower will comply with each of the following:

6.1    Reports and Certificates.  Borrower will provide to Lender such information as Lender reasonably requests regarding Borrower, the Guarantors, the Collateral, Borrower's operations and financial condition, and the operations and financial condition of Borrower's Affiliates and subsidiaries, if any.  At a minimum, such information will include the following periodic reports and certificates in form and substance satisfactory to Lender:

(a)    Within fifteen calendar days following the end of each month, agings of accounts payable and accounts receivable as of the last day for such month for Borrower and any Affiliates or subsidiaries specified by Lender, all in reasonable detail as requested by Lender, and such other periodic reports or certificates reasonably requested by Lender.

(b)    Within fifteen calendar days following the end of each month, the following financials in reasonable detail for Borrower and any Affiliates or subsidiaries of Borrower specified by Lender: (i) a balance sheet as of the close of such month along with a comparison to the same month in the previous calendar year; (ii) an income statement for (A) such month, (B) the part of the fiscal year ending in such month, and (C) the corresponding part of the fiscal year for the prior year; and (iii) a statement of cash flows as of the close of such month.

(c)    At least thirty days prior to the end of each fiscal year, a pro forma cash flow, income statement and balance sheet and collateral availability forecasts for the next twelve-

month period for Borrower and all of its subsidiaries plus any Affiliates reasonably requested by Lender.

(d)     Within 45 days following the end of each fiscal year, a detailed schedule of all insurance policies which Borrower has in force.

(e)     Within 120 days following the close of a fiscal year, a copy of the complete financial statements of Borrower reviewed by an independent certified public accounting firm reasonably acceptable to Lender.

6.2     Lockbox Account.

(a)     Within fifteen days after the Closing Date, Borrower will put in place a lockbox account pursuant to the Lockbox Account Agreement or a similar agreement acceptable to Lender that may be required by the applicable financial institution. Commencing from the creation of the lockbox account, Borrower will instruct any Person that is liable to Borrower in connection with an Approved Transaction to remit all payments due to Borrower to the lockbox account. Borrower also will deposit or cause to be deposited any Proceeds relating to the Collateral into the lockbox account.

(b)     The parties understand that some of Borrower's clients may elect to pay funds to an account other than the lockbox account. Contemporaneously with the execution of this Agreement, Borrower will execute any powers of attorney, domiciliation agreements and other documents and agreements necessary or reasonable in Lender's discretion to cause that any funds deposited into such other accounts will be transferred to the lockbox account automatically and without any further interaction or instruction from Borrower. If any amounts are paid to any accounts controlled by Borrower other than the lockbox account or accounts that automatically forward funds to the lockbox account, Borrower will immediately transfer such amounts to the lockbox account and use its best efforts to ensure that any future payments are paid to the lockbox account or to an account that automatically forwards funds to the lockbox account.

6.3     **[Reserved]**

6.4     **[Reserved]**

6.5     **[Reserved]**

6.6     Material Contracts. Contemporaneously with the delivery of the required quarterly financial statements, provide Lender with copies of (a) each Material Contract entered into since the delivery of the previously delivered quarterly financial statements, and (b) each material amendment or modification of any Material Contract entered into since the delivery of the previously delivered quarterly financial statements.

6.7     Notice of Events. As soon as possible, and in any event within three Business Days after the discovery of a relevant occurrence, Borrower will notify Lender in writing regarding the following events, describing with reasonable detail the facts relating to or giving rise to such event and the action which Borrower proposes to take with respect thereto:

24

(a)     any Default or Event of Default;

(b)     any Material Adverse Effect;

(c)     any litigation which if determined adversely to Borrower could reasonably result in a Material Adverse Effect;

(d)     any withdrawal or resignation of Borrower's independent accountants or any intention by Borrower to terminate its independent accountants;

(e)     any cessation by Borrower to make payment in the ordinary course of business to any of its creditors other than on account of a non-material dispute; or

(f)     any change in Borrower's executive officers or management team.

6.8     <u>Disclosure Updates</u>.

(a)     Promptly and in no event later than three Business Days after obtaining knowledge thereof, notify Lender if any information, exhibit, or report furnished to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made.

(b)     Promptly and in no event later than three Business Days after obtaining knowledge thereof, notify Lender if any information, exhibit, or report furnished to Lender becomes untrue due to a subsequent event, including but not limiting the foregoing, details of any material litigation, governmental proceeding or other similar action that may adversely affect Borrower's ability to repay the Obligations.

(c)     Notifications under this section will not cure or remedy the effect of Borrower providing any prior untrue statement of a material fact or omission of any material fact, nor will any notification have the effect of amending or modifying this Agreement or any of the schedules hereto.

6.9     <u>Taxes</u>.  Borrower will make due and timely payment or deposit of all federal, state, and local taxes, assessments, or contributions required of it by law and all local, state, and federal taxes or assessments imposed upon any properties belonging to it.  Borrower will execute and deliver to Lender, on demand, appropriate certificates attesting to the payment or deposits thereof.  Notwithstanding the foregoing, Borrower need not make any such payment if the amount or validity of such payment is contested by Borrower in good faith by appropriate proceedings and is adequately reserved against by Borrower.

6.10     <u>Insurance</u>.

(a)     At Borrower's expense, Borrower will maintain insurance (a) as may be required or specified under any agreement between Borrower and its clients and (b) with respect to its assets wherever located, in at least such amounts and with such coverage as are customary and reasonable in accordance with the sound business practices of companies in similar

businesses similarly situated and located, all as reasonably satisfactory to Lender. All such policies of insurance will be with responsible and reputable insurance companies reasonably acceptable to Lender. All property insurance policies covering the Collateral are to be made payable to Lender for the benefit of Lender, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as Lender may reasonably require to fully protect Lender's interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to Lender, with the loss payable (in respect of Collateral) and additional insured endorsements in favor of Lender and will provide for not less than thirty days (ten days in the case of non-payment) prior written notice to Lender of the exercise of any right of cancellation. If Borrower fails to maintain such insurance, Lender may arrange for such insurance at Borrower's expense and without any responsibility on Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Borrower will give Lender prompt notice of any loss exceeding $50,000 covered by its casualty or business interruption insurance. Upon the occurrence and during the continuance of an Event of Default, Lender will have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies. So long as no Event of Default has occurred and is continuing Borrower will have the right to reinvest proceeds of any casualty insurance claim in replacement assets necessary or useful in Borrower's business.

(b)     In addition to and in no way minimizing the foregoing or any other provision in this Agreement, as additional security for the payment and performance of the Obligations, Borrower hereby expressly assigns to Lender any and all money and proceeds (including, without limitation, proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of Borrower with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral. Borrower hereby directs the issuers of any such policies to pay all such monies directly to the Lender. Accordingly, whether or not an Event of Default exists, Lender at its discretion may execute and deliver proof of claim, receive all such monies, endorse checks and other instruments representing payment of such monies and adjust, litigate, compromise or release any claim against the issuer of any such policy, whether in Lender's name or in Borrower's name.

6.11   <u>Assignment of EXIM Credit Export Insurance</u>. Borrower will undertake all actions and deliver all documents necessary or reasonable to collaterally assign to Lender Borrower's EXIM Credit Export Insurance in a manner satisfactory to Lender prior to Lender providing any Advance to Borrower.

6.12   <u>Inspection Rights</u>. Borrower will permit Lender and any of its duly authorized representatives or agents to visit any of Borrower's properties to inspect the Collateral, other assets and Borrower's books and records, to conduct appraisals and valuations, to audit and examine and make copies of Borrower's books and records and to discuss Borrower's affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Lender may designate. In connection with such

inspection rights, as long as no Default or Event of Default has occurred, Lender or its designees may conduct such inspections, audits and examinations once every six months, starting on the date that is six months following the Closing Date.

6.13    Compliance with Laws.  Comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

6.14    Use and Maintenance.  So long as no Event of Default has occurred and is continuing, Borrower will have the right to quietly possess and use the Collateral as provided herein without interference by Lender.  Borrower, at its expense, will maintain the Collateral in good condition, reasonable wear and tear excepted, and will comply in all material respects with all laws, rules and regulations to which the use and operation of the Collateral may be or become subject.  Such obligation will extend to repair and replacement of any partial loss or damage to the Collateral including with the proceeds of any insurance claim, regardless of the cause, except to the extent such Collateral is obsolete or no longer necessary for Borrower's business.

6.14    Environmental.

(a)    Keep any property either owned or operated by it free of any liens or post bonds and comply, in all material respects, with environmental laws and provide to Lender documentation of such compliance if or when Lender reasonably requests.

(b)    Promptly notify Lender of any release of which Borrower has knowledge of a hazardous material in any reportable quantity from or onto property owned or operated by Borrower and take any remedial actions required to abate said release or otherwise to come into compliance, in all material respects, with applicable law.

(c)    Promptly, but in any event within three Business Days following its receipt thereof, provide Lender with written notice of any notice of or commencement of any action to be filed or taken against Borrower with respect to environmental issues, or upon written notice of a violation, citation, or other administrative order regarding the same from a Governmental Authority.

6.15    Formation of Subsidiaries.  Notify Lender within three Business Days following any time that Borrower forms any direct or indirect subsidiary or acquires any direct or indirect subsidiary after the Closing Date, and take such reasonable actions required by Lender to cause such subsidiary to be subject to or otherwise conform to (at Lender's discretion) this Agreement and the Loan Documents.

6.16    Assignable Material Contracts.  Unless otherwise approved by Lender in writing, use commercially reasonable efforts to ensure that any Material Contract entered into after the Closing Date permits or does not prohibit the collateral assignment of such agreement or the granting of a Lien in all of Borrower's rights under such agreement to Lender (and any transferees of Lender).

27

6.17    Existence.  Borrower will at all times maintain and preserve in full force and effect its existence, including being in good standing in its jurisdiction of organization and all other jurisdictions in which it is required to be registered and for which the failure to be so registered could reasonably be expected to have a Material Adverse Effect, and all rights and franchises, licenses and permits material to its business.

6.18    Further Assurances.  At any time upon the reasonable request of Lender, execute or deliver to Lender any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, opinions of counsel, and all other documents or agreements (the "Additional Documents") that Lender may reasonably request in form and substance reasonably satisfactory to Lender, in furtherance of the parties' intentions under this Agreement, including to create, perfect, and continue perfected or to better perfect Lender's Security Interest.  To the maximum extent permitted by applicable law, Borrower authorizes Lender to execute any such Additional Documents and to file such executed Additional Documents in any appropriate filing office as determined by Lender.

7.    **NEGATIVE COVENANTS**

Borrower covenants and agrees that without the express written consent of Lender, until termination of the Loan Facility and payment in full of the Obligations, Borrower will not do any of the following:

7.1    Indebtedness.  Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any indebtedness, except:

(a)    Indebtedness in favor of Lender arising under this Agreement or any other Loan Document;

(b)    Indebtedness for Permitted Liens;

(c)    Indebtedness incurred in the ordinary course of business for necessary materials, supplies, services, Inventory, etc.; and

(d)    Indebtedness existing on the Closing Date and disclosed on Schedule 5.14.

7.2    Liens.  Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

7.3    Reorganization.  (a) Make any material change in Borrower's business operations or shift any of Borrower's business operations to any subsidiary, Affiliate or other entity; (b) engage in any business other than the businesses currently engaged in by Borrower and any business substantially similar, incidental or related thereto; (c) cause any material change in Borrower's ownership whereby stockholders who were not stockholders of Borrower immediately prior to a transaction own more than 20% of the voting stock of Borrower after the transaction; (d) suspend operation of Borrower's business; (e) be a party to any merger, consolidation, reorganization, recapitalization, or reclassification of its stock; (f) liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution); (g) suspend or go out of a



28

substantial portion of its business; or (h) change its name, organizational identification number, state of organization, organizational identity, headquarters or location of its books and records.

7.5     Disposal of Assets.  Convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any of its assets other than in the ordinary course of business.

7.6     Acquisition of Assets.  Acquire any properties or assets that are not reasonably related to the conduct of Borrower's business activities at the Closing Date.

7.6     Prepayments.  Optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of an Affiliate.

7.7     Restricted Payments.

(a)     Pay salaries, bonuses, profit sharing payments, distributions, dividends, return of capital or any other compensation or distributions of any kind, whether monetarily or in-kind, to any equityholder, Affiliate, officer, director or other Person that controls, whether directly or indirectly, more than 10% of the voting power of Borrower's equity, in excess of 110% of that which was paid to such Person in the prior fiscal year.

(b)     Pay any management or consulting fees or expenses to any equityholder, Affiliate, officer, director, employee or other Person that controls, whether directly or indirectly, more than 10% of the voting power of Borrower's equity, in excess of 110% of that which was paid to such Person in the prior fiscal year.

(c)     Make any loans or advances to any equityholder, Affiliate, officer, director, employee or other Person that controls, whether directly or indirectly, more than 10% of the voting power of Borrower's equity.

(d)     Enter into or permit any transaction or arrangement with any equityholder, Affiliate, officer, director, employee or other Person that controls, whether directly or indirectly, more than 10% of the voting power of Borrower's equity other than on terms that are reasonably comparable to what Borrower could obtain in an arm's-length transaction with a Person with no relationship with Borrower.

7.8     Distributions. Pay any dividends (other than dividends payable solely in capital stock or dividends payable to Borrower) or make any other distribution or payment on account of or in redemption, retirement or purchase of any capital stock, or permit any of its Affiliates to do so, except that (i) Borrower may repurchase the stock of former employees pursuant to stock repurchase agreements as long as an Event of Default does not exist prior to such repurchase or would not exist after giving effect to such repurchase, and the aggregate amount of such repurchase does not exceed $25,000 in any fiscal year, and (ii) Borrower may convert any of its convertible securities into other securities pursuant to the terms of such convertible securities or otherwise in exchange thereof and make payments in cash for any fractional shares in connection therewith.

7.9 <u>Accounting Methods</u>. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

7.10 <u>Compliance</u>. Become an "investment company" under the Investment Company Act of 1940, as amended, or undertake as one of its important activities extending credit to purchase or carry margin stock, or use the proceeds of any Advance for that purpose; fail to meet the minimum funding requirements of ERISA or permit a Reportable Event or Prohibited Transaction, as defined in ERISA; fail to comply with the Federal Fair Labor Standards Act or violate any other law or regulation, if the violation could reasonably be expected to have a Material Adverse Effect or permit any of its Subsidiaries to do so.

## 8. EVENTS OF DEFAULT

Any one or more of the following events shall constitute an event of default (each, an "<u>Event of Default</u>") under this Agreement:

8.1 Borrower fails to pay when due and payable, or when declared due and payable pursuant to the terms of this Agreement, all or any portion of the principal of the Obligations, all or any portion of the Obligations consisting of interest, fees, or charges due to Lender, or any other amounts constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of five Business Days.

8.2 Borrower fails to perform or observe any term, condition, covenant or other agreement contained in this Agreement or in any of the other Loan Documents, in each case other than any such term, condition, covenant or agreement that is the subject of another provision of this <u>Section 8</u> (in which event such other provision of this <u>Section 8</u> shall govern), and such failure continues for a period of seven days after the earlier of the date on which (i) such failure first becomes known to any officer, director or other Person exercising any agency or control of any Borrower, or (ii) written notice of such failure is given by Lender to Borrower.

8.3 One or more judgments, orders, levies, attachments, assessments or other awards involving an aggregate amount of $50,000 or more (excluding any amount fully covered by insurance and to which the insurer has accepted liability in writing) is entered or filed against or with respect to the Collateral, Borrower or any of its assets.

8.4 Borrower (a) becomes insolvent, (b) is unable to, or admits in writing its inability to, pay debts as they generally mature, (c) makes a general assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its property, (d) files on its behalf or consents to an Insolvency Proceeding, (e) has an Insolvency Proceeding filed or instituted against it that is not timely controverted, (f) has an Insolvency Proceeding filed or instituted against it involuntarily that is not stayed or dismissed within 60 days after it is filed or instituted, (g) applies to a court for the appointment of a receiver, trustee or custodian for any of its assets, (h) has a receiver, trustee or custodian appointed for any of its assets (with or without its consent), (i) commences a self-liquidation of its assets, or (j) has an order for relief issued or entered in connection with any of the foregoing.

8.5     Borrower (a) is enjoined or in any way prevented by court, agency or other governmental order from continuing to conduct all or any material part of its business affairs, (b) suffers a casualty to any material asset or assets used in its business and which is not, except for deductibles acceptable to Lender, fully covered by insurance conforming to the requirements of this Agreement or (c) suffers a Material Adverse Change.

8.6     If a default occurs in one or more agreements to which Borrower is a party involving an aggregate amount of $50,000 or more, and such default results in a right by a third party, irrespective of whether exercised, to accelerate the maturity of Borrower's obligations thereunder or the default occurs at the final maturity of the obligations thereunder.

8.7     If any representation, warranty, certification, statement, or similar record made herein or in any other Loan Document or in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representation, warranty, certification, or other record already qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof.

8.8     If this Agreement or any other Loan Document that purports to create a Lien, fails or ceases to create a valid and perfected and first priority Lien on the Collateral covered thereby, except as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement or to the extent otherwise permitted hereby.

8.9     If the validity or enforceability of any Loan Document shall at any time for any reason, other than solely as a result of Lender's action or failure to act, is declared to be null and void, or a proceeding is commenced by Borrower or any of its Affiliates, or by any Governmental Authority having jurisdiction over Borrower or any of its Affiliates, seeking to establish the invalidity or unenforceability thereof, or Borrower or any of its Affiliates undertakes any action to deny that Borrower has any liability or obligation intended to be created under any Loan Document.

8.10     If there is a material impairment, in Lender's sole determination, (a) regarding the prospect of the repayment of any portion of the Obligations, including but not limited to potential impairment due to actions taken or threatened by any Governmental Authority, or (b) of the value or priority of Lender's interests in the Collateral.

8.11     Upon the indictment of, or institution of any legal process or proceeding against, Borrower or any of its officers or directors under any applicable law in which the relief, penalties or remedies sought or available are felony or include the forfeiture of more than $50,000 and/or the imposition of any stay or order which would materially affect the conduct of business by Borrower.

8.12     If the current equityholders of Borrower cease to have the power, directly or indirectly, to vote or direct the voting of the majority equity interests, or otherwise cease to have the controlling interests, for the election or appointment of the governing body of Borrower.

8.13    If the obligations of any Guarantor under the Guaranty are limited or terminated by operation of law or by an action of any Guarantor, other than in accordance with the express terms of this Agreement.

## 9.    RIGHTS AND REMEDIES UPON EVENT OF DEFAULT

9.1    Lender Rights.  Upon the occurrence and during the continuation of an Event of Default, Lender may in its sole discretion, in addition to any other rights or remedies provided for hereunder or under any other Loan Document or any other existing or future agreement by or among Lender and Borrower, or by applicable law, without notice of its election or actions and without demand, do any one or more of the following:

(a)    Declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents or otherwise, immediately due and payable in full, whereupon the same shall become and be immediately due and payable and Borrower shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by Borrower;

(b)    Declare the Loan Facility terminated, whereupon the Loan Facility will be terminated immediately together with any obligation of Lender to make Advances;

(c)    Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of Lender, but without affecting any of Lender's rights, security interests, mortgages or other interests in the Collateral and without affecting the Obligations;

(d)    Settle or adjust disputes and claims directly with Account Debtors for amounts and upon terms which Lender considers advisable upon which Lender will credit Borrower's loan account with only such net amounts received by Lender in payment of the disputed Accounts, after deducting all costs and expenses incurred or expended in connection therewith;

(e)    Cause Borrower to hold all Inventory in trust for Lender, segregate such Inventory from all other property of Borrower or in Borrower possession and conspicuously label the Inventory as the property of Lender;

(f)    Without notice or demand to Borrower, make such payments and do such acts that Lender considers reasonable or necessary to protect any of its interests in the Collateral, including to cause Borrower, at Borrower's expense, to assemble any or all of the Collateral and to deliver it or make it available as Lender directs;

(g)    Without notice to Borrower (which notice if later deemed necessary is expressly waived), and without constituting a retention of any Collateral in satisfaction of an obligation (including within the meaning of Section 9-620 of the UCC), hold or set off and apply to the Obligations any (i) balances and deposits of Borrower held or controlled by Lender (including any amounts in a lockbox or blocked account), or (ii) indebtedness at any time owing to or for the credit or the account of Borrower held by Lender;

(h)    Hold, or set off and apply, as cash collateral to secure the Obligation, any and all balances and deposits of Borrower held by Lender, including any amounts received in a lockbox or blocked account);

(i)    Claim, ship, recover, store, finish, repair, maintain, prepare for sale, advertise for sale, sell or take any other similar action that Lender deems reasonable or necessary in order to acquire and dispose of the Collateral in such manner and in such place and with such notice as Lender deems commercially reasonable or necessary, whether by public or private sale, for cash or on terms, by contract or otherwise;

(j)    Exercise all other rights and remedies available to Lender under this Agreement or under any other Loan Document or any other existing or future agreement by or among Lender and Borrower, or under applicable law.

9.2    Notwithstanding any of the foregoing, immediately upon the occurrence of any Event of Default described in <u>Section 8.4</u> or <u>Section 8.5</u>, and regardless of any knowledge of the occurrence of the event by Lender or Borrower, in addition to any remedies set forth above and without any notice or action by Lender, the Loan Facility will terminate automatically and immediately and the Obligations, inclusive of all accrued and unpaid interest thereon and all fees and expenses and all other amounts owing under this Agreement or under any of the other Loan Documents, will become due and payable automatically and immediately. Borrower will be obligated to repay the Obligations in full, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by Borrower.

9.3    <u>Further Actions</u>.  In addition to and not in limitation of the foregoing, upon the occurrence and solely during the continuation of an Event of Default, the parties agree to the following:

(a)    Lender is granted a license and right to use, without charge, any of Borrower's labels, patents, copyrights, and any other rights of use for any name, brand, trade secret, trade name, trademark, service mark or any property of a similar nature, including existing or future advertising matter.  Any of Borrower's rights under any franchise or license agreement will inure to Lender's benefit, subject to the foregoing.

(b)    Borrower will take all reasonable actions as directed by Lender to assign to Lender or its assigns all contracts specified by Lender to which Borrower is a party.

(c)    If and as directed by Lender, Borrower will assemble or organize the Collateral and deliver it or make it available to Lender at Borrower's expense.  Borrower authorizes Lender to enter any premises at which Collateral may be located, to take and maintain possession of all or any part of the Collateral and to pay, purchase, contest or compromise any encumbrance, charge or lien that in Lender's determination appears to be prior or superior to Lender's Security Interest and to pay all reasonable costs or expenses incurred in connection with such actions.  Borrower grants Lender a license to enter into any premises occupied by or owned by Borrower and to occupy such premises, without charge, in order to exercise any of Lender's rights provided in this Agreement, any of the other Loan Agreements, any other agreement by or among the parties, at law or in equity, or otherwise.

33

(d)     Borrower will pay Lender any deficiency that may exist after Lender's disposition of Collateral immediately upon receiving written notice from Lender.  Lender will remit any excess, without interest, to the party or parties entitled to such excess.

9.4     <u>Power of Attorney in Respect of the Collateral</u>.  Borrower hereby irrevocably appoints Lender (which appointment is coupled with an interest) upon the occurrence and during the continuance of an Event of Default, the true and lawful attorney in fact of Borrower with full power of substitution, for it and in its name: (a) to ask, demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all rents, issues, profits, avails, distributions, income, payment draws and other sums in which a security interest is granted under this Agreement with full power to settle, adjust or compromise any claim thereunder as fully as if Lender were Borrower itself, (b) to receive payment of and to endorse the name of Borrower to any items of Collateral (including checks, drafts and other orders for the payment of money) that come into Lender's possession or under Lender's control, (c) to make all demands, consents and waivers, or take any other action with respect to, the Collateral, (d) in Lender's discretion to file any claim or take any other action or proceedings, either in its own name or in the name of Borrower or otherwise, which Lender may reasonably deem necessary or appropriate to protect and preserve the right, title and interest of Lender in and to the Collateral, or (e) to otherwise act with respect thereto as though Lender were the outright owner of the Collateral.

9.5     <u>Remedies Cumulative</u>.  The rights and remedies of Lender under this Agreement, the other Loan Documents and any other agreements or under law or in equity will be cumulative.  Lender will have all other rights and remedies not inconsistent herewith as provided by law or in equity.  No exercise by Lender of one right or remedy will be deemed an election and no waiver by Lender of any Event of Default will be deemed a continuing waiver.  No delay by Lender will constitute a waiver, election, or acquiescence by it.

10.    **INDEMNIFICATION**

Whether or not the transactions contemplated hereby are consummated:

10.1    <u>General Indemnity</u>.  Borrower will pay, indemnify, and hold Lender and each of its officers, directors, employees, partners, agents, counsel and attorneys-in-fact (each, an "<u>Indemnified Person</u>") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, charges, expenses or disbursements (including Lender's expenses and reasonable attorney's fees) of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and any other Loan Documents, or the transactions contemplated hereby and thereby, and with respect to any investigation, litigation or proceeding (including any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, dissolution or relief of debtors or any appellate proceeding) related to this Agreement or any other Loan Document or the Advances or the use of the proceeds thereof, whether or not any Indemnified Person is a party thereto (all the foregoing, collectively, the "<u>Indemnified Liabilities</u>"); <u>provided</u>, that Borrower will have no obligation hereunder to any Indemnified Person with respect to Indemnified Liabilities arising from the gross negligence or willful misconduct of such Indemnified Person.

34

10.2    General Expenses.  Borrower will, upon demand, pay to Lender (or Lender, may charge to the Obligations) all the expenses which Lender may incur in connection with this Agreement, including but not limited to (i) the Indemnified Liabilities, (ii) the administration of this Agreement, (iii) the custody, preservation, use or operation of, or, upon an Event of Default, the sale of, collection from, or other realization upon, any of the Collateral in accordance with this Agreement and the other Loan Documents, (iv) the exercise or enforcement of any of the rights of Lender hereunder or (v) the failure by Borrower to perform or observe any of the provisions hereof.

10.3    Survival; Defense. The indemnity obligations in this Section 10 will survive payment of all other Obligations as well as the termination of this Agreement.  At the election of any Indemnified Person, Borrower will defend such Indemnified Person using legal counsel satisfactory to such Indemnified Person in such Indemnified Person's sole discretion, at the sole cost and expense of Borrower.  All indemnity amounts owing under this Section 10 will be paid within thirty (30) days after written demand.

11.    **CONTINUING SECURITY INTEREST**

Notwithstanding anything else in this Agreement, any other Loan Agreement, or any other agreement relating to the parties, this Agreement creates or will create, as applicable, a continuing Security Interest in the Collateral which will (a) remain in full force and effect until the Obligations have been paid in full in accordance with the provisions of this Agreement and the Loan Facility has expired or have been terminated, (b) be binding upon Borrower and its respective successors, transferees and assigns, and (c) inure to the benefit of, and be enforceable by, Lender, and its successors, transferees and assigns.  Upon payment in full of the Obligations in accordance with the provisions of this Agreement and the expiration or termination of the Loan Facility, the Security Interest granted hereby will terminate and all rights to the Collateral will revert to Borrower or any other Person entitled thereto.  At such time, Lender will authorize the filing of appropriate termination statements to terminate such Security Interests.  No transfer or renewal, extension, assignment, or termination of this Agreement or of any other Loan Document, or any other instrument or document executed and delivered by Borrower to Lender nor any additional Advances or other loans made by any Lender to Borrower, nor the taking of further security, nor the retaking or re-delivery of the Collateral to Borrower by Lender will release Borrower from any obligation, except a release or discharge executed in writing by Lender in accordance with the provisions of this Agreement.  Lender will not by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Lender and then only to the extent set forth therein.  A waiver by Lender of any right or remedy on any occasion or from time to time will not be construed as a bar to the exercise of such right or remedy by Lender on any other occasion.

12.    **FUTURE EXIM LOAN**

The parties enter into this Agreement with the anticipation that undertaking and completing this process may help Borrower to qualify in the future for a loan backed by EXIM.  As partial consideration for Lender providing the Loan Facility to Borrower, for twelve months following the Effective Date, Borrower expressly grants Lender a right of first refusal to underwrite any EXIM-guaranteed working capital loan.

13.    **GENERAL PROVISIONS**

13.1    Demand; Protest.  Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which Borrower may in any way be liable.

13.2    Cross Default; Cross Collateral.  Borrower agrees that (a) any other agreements between Borrower and Lender or any of Lender's Affiliates, whether now or in the future, are hereby amended or will be deemed to be amended so that a default under this Agreement is a default under all such other agreements and a default under any one of the other agreements is a default under this Agreement, and (b) unless expressly stated otherwise in another agreement, the Collateral under this Agreement secures the Obligations now or hereafter outstanding under all other agreements between Borrower and Lender and the Collateral pledged under any other agreement with Lender secures the Obligations under this Agreement.

13.3    Lender's Liability for Collateral.  So long as Lender complies with its obligations, if any, under Section 9207 of the UCC, Lender will not in any way or manner be liable or responsible for (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person whomsoever. Except as provided in the preceding sentence, all risk of loss, damage or destruction of the Collateral shall be borne by Borrower, except that which is a result of Lender's gross negligence or willful misconduct.

13.4    Merger, Amendments; Etc.  This Agreement and the other Loan Documents represent the entire understanding and the final agreement between the parties with respect to the transactions contemplated hereunder and may not be contradicted or qualified by any actual or potential prior or contemporaneous agreement, whether written or unwritten, or subsequent unwritten agreement, of the parties.  There are not nor do the parties intend for there to be any unwritten agreements between the parties regarding the subject matter herein.  No waiver of any provision of this Agreement or the other Loan Documents, no consent to any departure by Borrower herefrom, and no course of performance, course of dealing, patterns or practices of the parties are dispositive unless they are memorialized in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Lender and Borrower.

13.5    Notice.  Unless otherwise provided in this Agreement, all notices or demands or similar writings relating to this Agreement or any other Loan Document must be in writing and must be delivered personally or sent by registered or certified mail (postage prepaid, return receipt requested), overnight mail or courier or electronic mail:

If to Borrower:        **PETROGAS FIELD SERVICES, INC.**




Attn:

Email:


If to Lender:        **FDI CAPITAL, LLC**

1600 Wilson Blvd.

Suite 820

Arlington, VA 22209

Attn:

Email:

All notices or demands sent in accordance with this section will be deemed received (a) if personally delivered, upon delivery, (b) if by registered, certified mail or overnight mail or courier service, upon delivery as indicated by the delivery service, or (c) if by electronic mail, upon the sender's receipt of a written acknowledgment from the intended recipient (such as by a return email or other written acknowledgment).

13.6    Governing Law.

(a) THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, AND THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF VIRGINIA.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE COMMONWEALTH OF VIRGINIA AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS, LOCATED IN ARLINGTON COUNTY, VIRGINIA; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. BORROWER WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR



37

**TO OBJECT TO VENUE TO THE EXTENT A PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.**

       **(c)**    **TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, BORROWER WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  BORROWER REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED TO SHOW BORROWER'S WRITTEN CONSENT.**

    13.7    <u>New Subsidiaries</u>.  At Lender's discretion, subsidiaries (whether by acquisition or creation) of Borrower may be required to enter into this Agreement in a manner determined by Lender.  Upon the execution and delivery of any documentation required by Lender from any such new party, such party shall become a party hereunder with the same force and effect as if originally named as a party herein.  The obligations of Borrower hereunder will remain in full force and effect notwithstanding the addition of any new subsidiary hereunder.

    13.8    <u>Debtor-Creditor Relationship</u>.  The relationship between Lender and Borrower is solely that of creditor and debtor.  Lender has no fiduciary relationship or duty to Borrower arising out of or in connection with the Loan Documents or the transactions contemplated hereby.  There is no agency or joint venture relationship between Lender and Borrower by virtue of any Loan Document or any transaction contemplated herein.

    13.9    <u>Revival and Reinstatement of Obligations</u>.  If the incurrence or payment of the Obligations by Borrower or the transfer to Lender of any property should for any reason subsequently be asserted or declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the United States Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "<u>Voidable Transfer</u>"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of Lender related thereto, the liability of Borrower automatically will be revived, reinstated, and restored and will exist as though such Voidable Transfer had never been made.

    13.10   <u>Lender Expenses</u>.  Borrower agrees to pay any and all Lender expenses promptly after demand therefor by Lender.  Such Lender expenses may include but are not limited to all reasonable and reasonably documented costs or expenses (including reasonable attorneys' fees and expenses) incurred in connection with the preparation, negotiation, administration, and enforcement of the Loan Documents, reasonable audit fees incurred by Lender and Lender's reasonable and reasonably documented attorneys' fees and expenses incurred in maintaining, amending, enforcing or defending any Loan Documents (including direct fees and expenses of appeal), in connection with any action, whether or not suit is brought.  Borrower expressly agrees



that the obligations contained in this Section will survive termination of this Agreement and payment or satisfaction in full of all other Obligations.

13.11   Survival.  All representations and warranties made by Borrower in this Agreement and the other Loan Documents will be deemed to have been relied upon by Lender in its decision whether to enter into this Agreement and the other Loan Documents, regardless of any investigation made by Lender or on its behalf and notwithstanding that Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any Advance is extended, and will continue in full force and effect as long as any Obligation or any fee or any other amount payable under this Agreement or any the other Loan Documents is outstanding and unpaid.

13.12   USA PATRIOT Act.  If Lender deems it necessary or reasonable to obtain, verify and record information that identifies Borrower in accordance with the Patriot Act, Borrower will provide such information as requested by Lender.

13.13   Interpretation, Section Headings.  This Agreement and the other Loan Documents have been reviewed by all the parties and are intended to be construed and interpreted according to the ordinary meaning of the words used in order to accomplish fairly the purposes and intentions of the parties.  None of the Loan Documents nor any uncertainty or ambiguity in them shall be construed against the Lender or Borrower, whether under any rule of construction or otherwise.  Section headings and numbers have been set forth herein for convenience only and are not intended to affect the interpretation of any section.

13.14   Severability of Provisions.  Any provision of this Agreement that is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.  Each provision of this Agreement will be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

13.15   Counterparts; Electronic Execution.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, will be deemed to be an original, and all of which, when taken together, will constitute one and the same Agreement.  Delivery of an electronic copy of an executed counterpart of this Agreement by email or other electronic method of transmission will be effective as delivery of an original executed counterpart of this Agreement at the time the electronic method of transmission is effected.

[Signature Page Follows]

39

IN WITNESS WHEREOF, the undersigned parties hereto have caused this Agreement to be executed as of the date written above.

**PETROGAS FIELD SERVICES, INC.**

By: _____
      Name: GREYSON L. KIONDO
      Title: CHAIRMAN & CEO

**FDI CAPITAL, LLC**

By: _____
      Name:
      Title:

# DISCLOSURE SCHEDULES

## [IF ANY]

## EXHIBIT A

## FORM OF GUARANTEE

## **EXHIBIT B**

### **FORM OF BORROWING NOTICE**



1600 Wilson Blvd. Suite 820, Arlington, VA 22209, USA ◆ Tel: +1-703-752-5880 ◆ Fax: +1-703-752-7999 ◆ www.FDI.capital

## NOTICE OF BORROWING

_____, 2021

FDI Capital, LLC
1600 Wilson Blvd.
Suite 820
Arlington, VA 22209
Attn: **Brady Edholm, Managing Director**
Email: BEdholm@interlinkdc.com

Ladies and Gentlemen:

Reference is made to the Loan and Security Agreement dated as of _____, 2021 (as it may be amended from time to time, the "Loan Agreement,"), by and among FDI Capital, LLC and Petrogas Field Services, Inc. ("Borrower").

The undersigned is the Chairman and CEO of Borrower and hereby requests an Advance under the Loan Agreement and in that connection certifies as follows. (Capitalized terms used but not defined in this Notice are as defined in the Loan Agreement.)

1.      The amount of the proposed Advance is $_____.  The requested funding date of the proposed Advance is _____.

2.      As of this date, no Default or Event of Default has occurred and is continuing or will result from the making of the proposed Advance.  The representations and warranties of Borrower and the other Loan Parties contained in Section 5 of the Loan Agreement are true and correct in all material respects (provided that those representations and warranties expressly referring to a specific date are true and correct in all material respects as of such date).

3.      No circumstance has occurred and is continuing that would reasonably be expected to have a Material Adverse Effect.

4.      Enclosed with this Notice is the current Borrowing Base Certificate as required under the Loan Agreement.

5.      Enclosed with this Notice are instructions on the disbursement of funds to recipients.

Borrower agrees to notify you promptly before the funding of the Advance if any of the matters to which I have certified above shall not be true and correct on the Advance date.

Very truly yours,

**Greyson Kiondo, Chairman and CEO**

# EXHIBIT C

## FORM OF BORROWING BASE CERTIFICATE

**FDI CAPITAL**

### BORROWING BASE CERTIFICATE

Borrower: Petrogas Field Services Inc.

As of date: _____

| | | |
|---|---|---|
| A. Facility Amount | | $350,000 |
| B. Current Facility Usage | | (-) $100,000 |
| **C. Current Availability** | *(Line A minus Line B)* | **$250,000** |

| | | |
|---|---|---|
| D. Total Transaction Costs | | $315,000 |
| E. Total Adjusted Transaction Costs | | (-) $300,000 |
| F. Additional Funds Required by Borrower | *(Line D minus Line E)* | $15,000 |

| | | |
|---|---|---|
| G. Previous Payments by FDI (Outstanding) | | $100,000 |
| H. Previous Contribution by Borrower (Outstanding) | | $10,000 |
| I. Funds Available for Payment | *(Line E minus Line G)* | $200,000 |
| K. Remaining Borrower Contribution Due | *(Line F minus Line H)* | $5,000 |

| | | |
|---|---|---|
| L. Requested Draw | | $48,000 |
| M. Borrower Contribution New | | $2,000 |

| | | |
|---|---|---|
| **N. New Facility Usage** | *(Line B plus Line L)* | **$148,000** |
| **O. New Availability** | *(Line A minus Line N)* | **$202,000** |

**CERTIFICATION:**

This Borrowing Base Certificate is delivered pursuant ot the terms of the Loan Agreement (the "Agreement") dated _____ by and between FDI Capital, LLC (the "Lender") and _____ (the "Company"), as amended, and the information contained herein is true and correct as of the date set forth below. The representations and warranties set forth in the Agreement are true and correct and the Company is in compliance with all terms and provisions set forth in the Agreement. The Company also certifies that the payroll taxes have been paid and are current. No event of default, nor any event that upon notice or lapse of time, or both would constitute an event of default, shall have occurred and are continuing at such time.

Certified by:

_____
*(Authorized Signer)*

_____
*(Type/Print Name)*

# EXHIBIT D

## FORM OF LOCKBOX AGREEMENT